Sorry, mr. Gage, mr. McCollum is your client Good morning, may it please the court. This is a vaccine program case appeal. And it really focuses, there may be a couple things we end up arguing about, but it really focuses on the application of the Alton prong one test and Alton prong one requires me, my client, to produce a medical theory causally connecting the vaccination and the injury. That's not my paraphrase, that's a direct quote out of Alton. In this case, we presented a theory that Michael McCollum, who at age 51 developed narcolepsy four to six weeks after receipt of an influenza vaccine, that the nuclear peptides create a molecular mimic between the influenza vaccine and the neurocretin receptors in the brain, disturbing the sleep cycle. Okay, that that particular mimic has been found and has been published. In fact, the narcolepsy is uniquely positioned to demonstrate molecular mimicry in humans, specifically between H1N1 proteins and the hypercretin cell containing proteins, which papers that you'll see that it's in footnote three of my brief. And there are three papers cited there, but that is the Penloius, M-A-H-L-I-O-S is the name of the first. Is there a page in the appendix on which we could find it? Certainly, it's in my brief. So, let's see. I thought footnote three released a Fang Han? Yeah, that's the first one. Look at the second one. Mollier. You see, I quoted that. The appendix says 337. So I don't know if that's I mean I can look up and see if that was appendix. Is it 767 through 73. That's the article so that's the page number for the published article. But the down in the next footnote on footnote four and that's an appendix, that article looks like it was produced in its entirety appendix 88 through 102. Antibodies to influenza, nuclear protein, cross-reactive human hypocretin receptor. So, I just want to start with this. These are the world's leading researchers in this particular area. Narcolepsy and what's causing narcolepsy. There's been research all over the globe. There are different groups doing that research. Some are at Stanford, some are in China, some are in England. They've published that the H1 there's a there's an identified molecular mimic between the vaccine and the part of the brain that controls the sleep cycle. When you say that between the vaccine and the brain, which study are you talking about and which vaccine are you talking about? Well, those particular studies. Because the Han reference you cited to us doesn't have anything to do with vaccines, does it? It's the wild virus. Well, actually, and that's a good point. The fact is, the thing that we know is the wild virus has in common with the vaccine that Mr. McCollum received is the H1N1 virus. The proteins in the H1N1 virus have to be in the vaccine in order to relay immunity. That's the thing that has the H1N1 protein in it and does not have an adjuvant in it is the wild virus. So he got that particular protein from that vaccine. I mean, there's no other way, at least in the record, for him to have received that. But I cited probably a half dozen of those research articles in there. Those two footnotes, I think, contain five of them. But let's just can I just just clarify, though, because it's my understanding of the record. And the special master's opinion is that there's no direct study linking the U.S. vaccine to narcolepsy. Yeah, I know. I don't believe that that's that's correct. Your honor, which study can you point me to then? Well, I mean, that's correct in terms of what the special master determined. I mean, Judge Hughes correctly recited what the special master found. You're taking issue with the special master. Well, I am. I am doing that also. However, for instance, the. The article in the. It's I believe it's the only two, but it's at the appendix at page ninety five. When we're talking about the NP content, that's the the the the thing that causes the molecular mimic. Between the hyper creatine cells and the H1N1 virus is the nuclear protein within the H1N1 virus itself. So the vaccines that were given in this country, if you look at page ninety five of the appendix, that list there, the pandemics, which was not given in this country, is on the bottom. And that's for comparison. But the NP content for all the other. These are all influenza vaccines that are given in this country. I mean, that's what they were studying there. And so this paper directly looked at that question. Vaccines given to people in this country. Do they have a similar NP content or how high are their NP content? Some are high and similar. In fact, one is higher than the than the pandemics. There were some. So. So let me see if I understand this. Your theory is that Ahmed to suggest that the NP factor is the critical factor for narcolepsy. And that there's ample evidence that the US vaccine has higher NP factor than than the pandemics study, which did show a connection between a different form of the vaccine in England versus here. I almost agree with that. It's some were high, but not as high. There was one that was higher. Some were kind of in the mid range. But the research was designed to show the hypothesis of these researchers that this publication was that it's the NP content that's doing it. They found the molecular mimic in the nuclear protein, the NP. It's not in an adjuvant. It's in the NP. And people in this country are being injected with that. And the follow up when we did our motion to reconsider, and I'm going to try and pronounce the name of that article, but it's Samak Tribune, I think it does Ahmed to Ahmed to sorry, rule out the adjuvant or just suggest that the NP, along with the adjuvant is what's causing the problem. It just suggests that the NP is the trigger for narcolepsy. They did not- It doesn't say it's the sole trigger. They did not attempt to rule out an adjuvant. That wasn't what they were trying to do. They were trying to show that they found what they said, okay, we found the mimic, which is a big deal in their portion of science. Look, we've identified it here. They go through genetic coding. We found enough genetic code. This is enough to confuse the immune system, cause narcolepsy. So let's look at the vaccines that were given in this country. Do any of them have high NP contents? And they said, well, look at this. We have at least several of them that do. And so that was their hypothesis with that particular article. But let's take a step back from that. The special master found that the NP is proposed by some of the reliable literature to be the trigger for the autoimmune process. Where is this? This is on page 22 of his decision, page 23 of the appendix. In the third paragraph down on that page, he talks about his earlier decision. He says, the general theory that certain formulations of H1N1 containing flu vaccines can cause narcolepsy due to their NP content has several reliable components. So that's from my question to this panel, of course, is how is that not a theory? That is, how do I not, how have I not satisfied out in step one with presenting a theory when he talks about my theory? And he does so and says that there are several reliable, whatever the words were, reliable components to that, which he's talking about the medical articles. But he then goes on and suggests that some of that evidence, at least, is based upon a different vaccine. No, our theory on the NP content is from that table that we just got through looking at on page 95 of the appendix. I know, but I'm looking at what you're reading from his report. He agrees that there are theories out there, but then suggests that certain formulations can do it, but then those aren't based upon the American vaccine. But the theories that we're talking about, that table, are based on the American vaccines. That's why that table was put there. Okay, you're into your rebuttal. Do you want to continue or save time? I want to say a couple of things. We know what his, the reason he didn't, it's a real reason for this appeal. If I was just here saying, why don't I convince you that the vaccines cause narcolepsy? I would assume I would have an uphill battle. That's not what you, this appellate court, is here for. I want you to enforce out in prong one. I mean, it's really that simple. We don't have to guess what the special master was thinking. He tells us. He says that petitioner offered no direct evidence suggesting that the version of the vaccine that he received has been tested in connection with narcolepsy to the degree other vaccine pandemics has. That is the standard he put up. We didn't produce evidence that the vaccines in this country have been tested to the extent that pandemics was. And then he said that we did not wholly eliminate the adjuvant as possibly playing an important role. Alton doesn't require me to show the testing to any particular level. And I don't have to wholly eliminate anything. How does a special master, that bar is set so high that no vaccine petitioner would ever get over that bar. How do I wholly eliminate other possibilities? How do I do that? How do I wholly eliminate an adjuvant from a vaccine that isn't even used in this country? There's no publications on it. People don't research that sort of thing. We have a 51-year-old man who developed narcolepsy four to six weeks after receipt of a vaccine. And this is a childhood or adolescent disease. He should not have developed narcolepsy then. He had another vaccine, and he had a spike in his symptoms. And I want to just put that out there. We put all that evidence on. We elicited testimony on it. We submitted medical records. We had the people who were the McCollums testifying about what they did with their doctor. We did not waive that argument, and he did not address it. So I'll just leave that there. But if special masters are free under Alfin to say, I'm going to require you to go out and do research or find research that wholly eliminates a potential cause, we can't win any vaccine case. We would only win table cases. There are no cause and effect cases. We can't meet that standard. And to show that, I mean, this court has said numerous times that we don't have to do epidemiological studies. It's the whole reason with Alfin and Capizano. We don't have to do that. And what he required was epidemiology. Mr. Gates, you've completely exhausted your time. Let's hear from the government. I'll restore two minutes. May it please the court. My name is Robert Coleman. I represent the respondent, Secretary of Health and Human Services. Can I just ask you this? If the special master had reached the completely opposite conclusion, that this medical evidence showed a theory that was sufficient under Alfin 1, would that have been arbitrary and capricious? I believe it would, primarily because there is evidence here. The evidence here is insufficient to show that the actual type of vaccine that was administered to Petitioner causes narcolepsy. That's the primary problem. We know that, I mean, the English study seems pretty conclusive that the English vaccine does cause narcolepsy, right? If this was the English vaccine, we wouldn't be here. Right. So then we have the two Canadian studies that suggest, looking at that English study, that really what's causing it there is primarily the protein. And I suspect you dispute that characterization. Let's assume that's what it says. And then we go to the American vaccine, and we know it has, and maybe I'm wrong about this, but I don't think I am, that it has protein levels comparable to or higher than the English study. Why isn't those three studies put together if the special master had made that finding a sufficient theory of causation? Primarily because there's other evidence in the record as well, indicating, for instance, that the— Right, right, I get that. But isn't that the special master's job? That's why I ask it to you in that way. If the special master balances all this evidence and says, well, yeah, there may be this epidemiological study, but we kind of discount epidemiological studies. There's nothing else that suggests that the adjuvant is the key role. It's him to go the other way, so I'm going to find this is sufficient. I get that he didn't, and you think that's not arbitrary and capricious, but I just don't understand why you'd say if he came out the other way that that would be arbitrary and capricious. And it would be a close call. And there would be a reasonable argument, though, I believe, from a respondent that it is arbitrary and capricious because of the other evidence that outweighs the evidence that petitioner provided to you. And what evidence is that? Primarily, there are four particular studies that are addressed. Two of them are addressed on page 16 of the appendix. This is the Utiparala study and the Partnin II study. And on page 37 of the appendix, there's the R. Vandermost study and the third Ahmed article. And all four of those articles, to an extent— What about the Duffy study? And Duffy as well. So these five articles, four of them are not the epidemiologic study. The epidemiologic study is separate. So the four studies indicate that, to a greater or lesser extent, that basically it's a dual effect between the high nucleoprotein content and adjuvant. So it's the presence of the adjuvant that somehow contributes to the triggering of narcolepsy. Without one or the other of those factors, we don't have narcolepsy as a result of vaccination. And that is supported by the Duffy study, which is a large-scale epidemiologic study and the only evidence that directly addresses the type of vaccination the petitioner received here. But isn't the Hahn study contradictory to that because it suggests that the wild virus can trigger narcolepsy where there isn't an adjuvant? Yes, to an extent it does contradict. However, there are problems with the Hahn study's reliability, which the special master addresses on page 12 and 13 of the appendix in and of itself. But additionally, the Hahn study involves just the wild version of the virus. And on page 24 of the appendix, the special master indicated that here it's uncontested that petitioner received an inactivated version of the vaccine. So we're not dealing with the wild version of the virus. The wild version of the virus can have effects that the vaccine will not have, primarily because that vaccine involves a version of the virus that's inactivated, weakened, in order to use it in a vaccine. Because the special master here reviewed all of the evidence, the reliable evidence, and drew plausible inferences from that evidence and provided a rational basis for his decision, respondent respectfully requests that this court affirm. Thank you. Thank you very much. Your Honors, I remember when the Stevens analysis came out from Special Master Galkowitz in this program since its inception. Where he set two extra standards for petitioners to prove their case. And then Alvin came out and said, Special Masters don't get to set standards, they have to enforce the law. The standards set in Stevens are in fact significantly lower than the standard that Special Master Corcoran has set in this case. All in Stevens, Special Master Galkowitz just said, Get me some published, I want published literature and I want this to be accepted in the medical community at least at some level. This court announced and said, you can't do that. The irony of course is, here we have the best researchers in the world on this subject publishing on this, saying that it's the MP content that does this. And we have a petitioner who is at the Stanford Sleep Study. Well, wait, you say that, but then you don't cite to any study that says it's the MP component alone. And your friend on the other side cited to some studies that suggest it's the MP in combination with adjuvant. Not only the Han, but Jamach Jabun, I'm sorry how I pronounce that, both deal with non-adjuvant. Well, sure, but Han's the wild virus. So I don't see how it's arbitrary or preposterous to treat that different than a vaccine. What's the other one you're talking about? The one we filed in relation to the motion to reconsider. And that would, Special Master saw that as a wild virus, although I don't believe that is. But the question's easier, Your Honors. Can the Special Master make me wholly eliminate a potential alternate cause? I mean, it's scientifically impossible. We don't have to speculate. That's what he said he wanted, wholly eliminate something. I can't do it. And he says that I have to show that the vaccines that my client got has to be tested to the same level. Many of these vaccines never get tested, especially the new ones. We deal with these things where the first post-licensure study hasn't even come out when the case is filed. How do I do that? He has set a standard that is so high, I cannot reach that standard. And that violates Althan. It violates not only the language, but the reason for Althan was because the case before that, which was setting standards that we had to meet, the Special Master said do that. I mean, I don't care what the vaccine is. I know I'm over my time, and I apologize. But I don't care what the vaccine is. If I have to wholly eliminate other possible causes, I cannot win any cases. It doesn't matter. Thank you, Mr. Gage. Your time is up.